771 So.2d 62 (2000)
Jose I. SOLER; Resol, Inc., a Florida corporation and Primary Holdings, Inc., a Florida corporation, by and through its shareholder, Jose I. Soler, Appellants,
v.
SECONDARY HOLDINGS, INC., a Florida corporation, Shores Developments, Inc., a Florida corporation, Wayne Rose, Michael Latterner, and Budd Laurance, Appellees.
No. 3D99-1064.
District Court of Appeal of Florida, Third District.
October 25, 2000.
*63 Rodriguez & Angelo, P.A. and Jorge L. Guerra and Paulino A. Nunez, Jr., Miami, for appellants.
Robert J. Bryan; Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A. and Joel S. Perwin, Miami, for appellees.
Before COPE, GREEN, and SORONDO, JJ.
GREEN, J.
This is an appeal from the entry of final summary judgments in favor of the appellees, Secondary Holdings, Inc. ("Secondary"), Shores Development, Inc. ("Shores"), Wayne Rosen, Michael Latterner and Budd Laurence [collectively referred to as "appellees"], in a cause of action based on two alleged real estate deals that had supposedly gone awry.[1] We affirm in part and reverse in part.

PROCEDURAL HISTORY
Jose Soler and Resol, Inc., an engineering contracting company owned and operated by Soler and his father, brought a 17-count complaint, which was subsequently amended, against the appellees claiming fraud, breach of contract, recission, securities violations and unjust enrichment arising out of the real estate deals. The complaint also sought an accounting. Specifically, the complaint alleged that in 1993, Soler verbally entered into a joint venture with Latterner and Rosen to purchase and develop two groups of land parcels: "Spanish Lakes," eighty-five (85) acres of land in the Miami Country Club area; and "Doral Estates," one-hundred (100) acres in the Doral area. The developed lots were to be sold to residential builders, most likely Lennar Corp., with whom Latterner had a long-standing working relationship. These three men allegedly agreed that: (1) each would share equally in the profits and losses resulting from the sale of the developed lots; (2) they would develop the parcels in a combined effort; and (3) Resol would do the site work, as long as it met any competing bid and posted a guarantee/performance bond.
Soler also alleged that he and Latterner formed Primary Holdings, Inc. ("Primary Holdings"), in order to take title to the Spanish Lakes property; that Laurence purchased the Spanish Lakes lots and financed the property's purchase through Primary Holdings; and that Primary Holdings "hired" Resol to do the site development work on Spanish Lakes. With regard to Doral Estates, Soler claimed that as part of the joint venture he personally placed deposits on 15 parcels of property in Doral Estates, that the appellees developed these lots without his knowledge, and that as a result he was deprived of his share of the profits. The appellees never answered Soler's amended complaint.
In Laurence v. Soler, 706 So.2d 896 (Fla. 3d DCA 1998)("Soler I"), this court issued a writ of certiorari, abating the actions at law regarding the alleged partnership transactions until a determination was made as to whether a partnership/joint venture actually existed. If the court found the existence of a partnership/joint venture, then an accounting was to be held. On remand, the parties proceeded with discovery, to determine whether a partnership/joint venture existed regarding Spanish Lakes and/or Doral Estates.
In the summer of 1998, the parties agreed to resolve the merits of their disputesthose of this litigation and two other cases between themby arbitration before *64 a single arbitrator, Stanley Price. The arbitration agreement left the circuit court with a limited amount of jurisdiction. Specifically, the agreement provided in pertinent part:
10. In order to place the Litigations "at issue," as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure,[2] the parties will continue to submit all pleading-related, pre-answer motions to the circuit court. (footnote added).
One of the companion cases was arbitrated in the summer/fall of 1998. This arbitration did not bode well for the appellees. In fact, they lost on virtually every issue of fact and law. Consequently, the appellees moved to vacate the arbitration award and to disqualify the arbitrator from all subsequent proceedings. The circuit court denied the motions and confirmed the arbitration award.
Subsequently, in this case the appellees moved for summary judgment on the ground that Soler had compromised any interest that he may have had in Primary Holdings and Spanish Lakes when he signed a memorandum "relinquish[ing] any interest he had in Primary Holdings" and when he signed a general release six weeks later, accepting $550,000 in full and complete settlement of all claims associated with Spanish Lakes. The appellees also sought summary judgment on the ground that Soler had never entered into a joint venture with the appellees regarding Doral Estates, and that if there had been a joint venture, it ended when Soler requested and received the return of the deposits that he had placed on the Doral Estates parcels.
Soler moved to strike the summary judgment motion, to stay the litigation, and to compel arbitration on the ground that the trial court did not have the jurisdiction to adjudicate the motion for summary judgment. The trial court denied Soler's motion to strike, ruling that the parties had not agreed to arbitrate any pre-trial motions. Moreover, the trial court held that the summary judgment motion was a "pre-answer motion" pursuant to paragraph 10 of the arbitration agreement, was excluded from arbitration.
Soler thereafter opposed the motion for summary judgment on grounds that there were issues of fact regarding whether the settlement agreement and release actually extinguished Soler's interest in Primary Holdings; whether the release had been procured by fraud; whether the release and the $550,000 payment was made in settlement of all of Soler's claims regarding Primary Holdings or only of Resol's claims as the site developer of Spanish Lakes; whether the partnership/joint venture included Doral Estates; whether Soler had placed deposits on the Doral Estate parcels for his personal interest or in furtherance of a joint venture; and whether the return of his deposits extinguished Soler's interest in Doral Estates.
The trial court granted the summary judgment, in total, without specifying its basis. Soler appeals.
Soler raises three primary issues on this appeal, each of which will be discussed separately. Initially, Soler contends that the trial court lacked jurisdiction to entertain the motion for summary judgment because of the parties' agreement to arbitrate their disputes. Alternatively, Soler argues that if the trial court had jurisdiction to consider the motion, the trial court erred in granting summary judgment on the Spanish Lakes issue because the release signed by Soler could not bar his claim based upon his allegation that it was *65 procured by the appellees' fraudulent concealment. Soler further argues that the trial court erred in granting summary judgment with regards to Doral Estates because there is substantial record evidence which shows a genuine issue of material fact.

A. Jurisdiction of the Trial Court to Entertain the Summary Judgment Motion.
It is undisputed that the parties agreed to arbitrate their disputes, including the case at issue here. Indeed, the parties signed an arbitration agreement which provided in pertinent part that:
The Aristotle Litigation, the Spanish Lakes Litigation[3] and the Latterner Litigation will be referred to collectively, as the "Litigations." The Litigations include all claims, counterclaims, third party claims, cross claims or ancillary claims for relief which could have been brought in connection with any of the aforementioned disputes by any party...
1. This Agreement provides for a private, binding and final arbitration of all disputes between the parties, as listed above.
2. It is the intention of the parties that the arbitration provided for in this Agreement constitutes the mechanism for resolution of all remaining differences between the parties with respect to the claims and defenses in or related to the Litigations.
* * *
10. In order to place the Litigations "at issue," as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure, the parties will continue to submit all pleading-related, pre-answer motions to the circuit court.
* * *
16. It is the parties' intent that the arbitration fully and finally determine all issues which have been, or which could have been, raised in the Litigations. The arbitration award shall be final and binding upon the parties, and may be challenged only upon the grounds specified in Florida Statute § 682.13.
Soler argues that the trial court lacked the jurisdiction to rule on the appellees' motion for summary judgment, because the parties agreed to arbitrate this entire dispute; that the arbitration agreement clearly provides that "all remaining differences" were to be resolved by arbitration; and that all doubts had to be resolved in favor of arbitration, citing, State Farm Fire & Casualty Company v. Middleton, 648 So.2d 1200, 1201-02 (Fla. 3d DCA 1995)(Florida has a preference for the resolution of conflicts through extra-judicial means, "especially arbitration, for which the parties have themselves contracted."). Moreover, Soler contends that paragraph 10 of the arbitration agreement prohibited the trial court from hearing anything regarding this case, except "defensive motions attacking pleadings." We disagree.
A large portion of the appellees' motion for summary judgment asserts that all of the issues regarding Spanish Lakes have been disposed of by a settlement agreement between the parties. As the trial court noted, this portion of the summary judgment motion was clearly "pleading-related" and a "pre-answer motion," as required by paragraph 10 of the arbitration agreement.[4] Thus, despite Soler's *66 contention otherwise, we find that the question of whether or not the Spanish Lakes controversy was settled was within the realm of the trial court's jurisdiction, because if the matter was settled, there would be nothing to litigate, or arbitrate, in this regard.
In addition to the language of paragraph 10, the trial court observed that the entire arbitration agreement "talks totally about trying cases and trying the issues and what you're going to submit to [the arbitrator]." Thus, the trial court correctly found that the arbitration agreement, as a whole, demonstrated that the parties only intended to try substantive issues, not the threshold issue of whether or not there was an arbitrable issue in the first place.[5]See Seifert v. U.S. Home Corp., 750 So.2d 633, 636 (Fla.1999)(determination of whether arbitration is required for a particular dispute is a matter of contract interpretation); Thomas W. Ward & Assoc., Inc. v. Spinks, 574 So.2d 169, 170 (Fla. 4th DCA 1990)(stating that: "[w]hether or not a dispute should be submitted to arbitration is a question for the court to determine from the contract of the parties."). Because we believe that the trial court's finding was not erroneous, we affirm the court's jurisdiction to consider the Spanish Lakes summary judgment motion. See McTeague v. Treibits, 388 So.2d 309, 314 (Fla. 4th DCA 1980)(on appeal, construction placed upon a contract by trial court should be affirmed unless clearly erroneous).
The dissent's assertion that the trial court erred in ruling on the summary judgment because to do so, runs contrary to State Farm Fire and Casualty Company v. Licea, 685 So.2d 1285 (Fla.1996) and Paradise Plaza Condominium Association, Incorporated v. Reinsurance Corporation, 685 So.2d 937 (Fla. 3d DCA 1996)(en banc), with all due respect, is simply wrong. To begin with, Licea held that an appraisal provision in a homeowner's insurance policy was not void for lack of mutuality simply because it contained a clause under which the insurer retained its right to deny coverage. Licea, 685 So.2d at 1288. Thus, its holding has no bearing on the matters at issue here. The dissent, however, uses Licea to support its position that "any interpretation of a contract or term which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Dissent at 73. We believe that finding that "all means all," as the dissent suggests, would leave paragraph 10 of the arbitration agreement with no effect, and thus is not the preferred manner in which to interpret that agreement. Moreover, in Paradise Plaza, which like Licea, found that an insurer had a right to contest insurance coverage under an appraisal clause, this court held that the decision of the order in which the issues of damages and coverage are to be determined is left solely to the discretion of the trial judge. Thus, analogously, in this case, the determination as to whether there is an arbitrable issue should also, as we have found, be left to the discretion of the trial court.
Further, the dissent's argument that the case of Dadeland Square, Limited v. Gould, 763 So.2d 524 (Fla. 3d DCA 2000) is *67 analogous to this case is, we think, a far stretch at best. In Gould, the parties had already been to arbitration for their case, when Dadeland moved to vacate the arbitration award based on the arbitrator's relationship to the parties. Arbitration in the case here has not yet taken place.[6] Thus, there is no "post-loss gambit" here, as suggested by the dissent. Dissent p. 74. Accordingly, there was no waiver of appellee's position, that the Spanish Lakes controversy was not an issue and certainly not an arbitrable issue, and the trial court clearly had the discretion to rule on appellee's motion for summary judgment. That said, we now address the merits of the motion as to both the Spanish Lakes and Doral Estates properties, respectively.

SPANISH LAKES
The undisputed facts regarding Spanish Lakes, taken in the light most favorable to Soler, the non-moving party, show that on or about May 2, 1994, the parties formed Primary Holdings, in part, to hold title to the Spanish Lakes property. Rosen chose to have his interest held through his father's corporation, Shores, so Latterner and Soler were each allotted fifty-percent (50%) of the stock of Primary Holdings. Profits were to be split two-thirds (2/3) to Primary Holdings and (1/3) to Shores, consistent with the parties' ultimate interest in the venture.
Primary Holdings hired Resol to develop "Phase I" of Spanish Lakes. By contract, Resol was to complete the specified work within six months from receipt of the last of the permits. The last permit was obtained May 1995. Thus, pursuant to its contract with Primary Holdings, Resol was required to have the Spanish Lakes site work completed by November 1995. A business associate of Latterner, Laurence, purchased the Spanish Lakes property and resold it to Primary Holdings, taking a note and mortgage that were to be repaid from the proceeds of the sale of developed lots. Thereafter, Primary Holdings contracted to sell the developed Spanish Lakes lots to Lennar. The Lennar contract with Primary Holdings called for the first phase of Spanish Lakes to be completed by May 15, 1995. Obviously, Resol missed Lennar's deadline. Primary Holdings then began to experience financial pressures.
In or about mid-August 1995, Rosen/Shores resigned from the Spanish Lakes project, leaving Soler, Latterner, and Primary Holdings, as the remaining partners. Rosen, however, continued to work on the project. At about this time, Latterner made a "capital call" (i.e. a request for payment on the loan) to Soler, in a letter which stated:
Pursuant to the contract executed between Primary Holdings, Inc. and Budd Laurence for the purchase of Spanish Lakes an interest payment is due Mr. Laurence for the period of June 15th through August 15th, 1995. Additionally, as you are aware, interest payments will also soon be due for the period running from August 15th through September 15th. These interest payments are mandated by the contract for the sale and purchase of the property as well as the promissory notes given in connection with this transaction. I believe you are in possession of these documents but if you are not please contact me and I will provide them to you. Like payment are due monthly pursuant to these documents.
Your respective share of the interest owed at present is $94,472.09. Additionally, you will soon be obligated for your respective share in the amounts due on or before September 15, 1995, which is $31,490.70 and any further amounts until closing.
* * *
I am ready, willing and able to pay my proportionate share of the interest when *68 due. I am certain that you will likewise comply with this as one of your obligations as a partner in this deal. Please provide me with a draft in the amount of $94,472.09 made payable to Budd Laurence within 48 hours.
* * *
P.S. I've increased your share to 50% since Wayne [Rosen] is out of the deal.
The closing date for Phase I was then tentatively scheduled for September 15, 1995. By that time, the project owed Resol more than $700,000 for site work that had been performed on the property.
On September 13, 1995, Soler was summoned to a meeting attended by Laurence, Latterner and Rosen. At this meeting, the appellees accused Soler and Resol of rendering the Spanish Lakes project unprofitable. They threatened that if Soler did not relinquish his interest in Primary Holdings, Laurence would conduct a "friendly foreclosure" against Primary Holdings. This proceeding could take Primary Holdings' only asset (i.e., the Spanish Lakes property) and leave Resol with no source of payment of the $700,000 it was owed for the site work. Moreover, Soler was told that the only way that he could prevent foreclosure was to cooperate and relinquish his interest in Primary Holdings. Appellees handed Soler a three-paragraph memorandum, which Soler signed relinquishing his fifty percent (50%) interest in Primary Holdings. Specifically, this memorandum provided that:
# 1 JOE SOLER agrees this date to relinquish any claim, position and/or stock in PRIMARY HOLDINGS, INC.
# 2 JOE SOLER will finish PHASE I within SPANISH LAKES SUBDIVISION for TWO DOLLARS AND 50/100 ($2.50) per cubic yard. Approximately 210,000 cubic yards which will be cross sectioned at completion and computed at $2.50 per cubic yard.
# 3 Budd Laurence, Wayne Rosen, and Joe Soler will each get one competitive bid for the sewer, water, paving and drainage of the First Phase. Predicated on those bids an average will be taken to determine the settlement price with RESOL INC. to make the final payment due to RESOL INC. on PHASE I.
Two days after Soler's resignation from Primary Holdings, the sale of Phase I of Spanish Lakes to Lennar, closed. The closing netted Primary Holdings 3.6 million dollars.
The September 13, 1995 memorandum was subsequently executed on October 30, 1995, when Soler signed a general release, prepared by his attorney, which provided in pertinent part:
That Resol, Inc., ..., Esteban Soler and Jose I Soler, ..., jointly and severally (collectively the "Resol Group"), for and in consideration of a General Release and other considerations received from or on behalf of Primary Holdings, Inc.,...,Shores Development, Inc., ..., Michael Latterner, Budd Lawrence(sic),... and Wayne Rosen (collectively the "Primary Group"), the receipt and sufficiency of which are hereby acknowledged;
HEREBY remise, release, acquit, satisfy, and forever discharge the Primary Group, ..., jointly and severally, from any and all manner of action and causes of action, ..., and demands whatsoever, on any basis, in law or equity, which the Resol Group, jointly or severally, ever had, now has, or hereafter can, shall, or may have against the Primary Group for, upon, or by reason of any matter, cause, or thing whatsoever (including, without limitation, any construction, or development activities), from the beginning of the world to the day of these presents arising from, in connection with, or in any way related to all or any portion of that certain real property located in Dade County and more particularly *69 described as [Spanish Lakes, Phase I].[7]
Upon the signing of this release, Resol was paid $550,000.
Soler contends that the September 13 memorandum and the October 30 release are void on grounds of fraudulent misrepresentation and/or concealment. Specifically, Soler claims that he would not have signed either the September 13 memorandum or the October 30 release had he known that the sale of the Spanish Lakes property would close, or had closed, on September 15, 1995. Thus, Soler contends that the appellees' concealment of the Spanish Lakes closing constitutes fraudulent concealment, and as such, he should be allowed to rescind both the memorandum and release.
The law, however, is clear that a claim of fraudulent misrepresentation and/or concealment requires proof of detrimental reliance on a material misrepresentation. See Johnson v. Davis, 480 So.2d 625, 627 (Fla.1985); see also Tourismart of America, Inc. v. Gonzalez, 498 So.2d 469, 471 (Fla. 3d DCA 1986)(a cause of action for fraud requires a showing of a representation made by the defendant with the intent to induce the plaintiff to act, that the representation was false, that the defendant knew the representation to be false, and the plaintiff relied on the representation to his injury). Here, Soler unequivocally testified at his July 10, 1997 deposition that even if he had known about the Spanish Lakes closing he still would have signed the general release. Specifically, Soler testified to the following:
Q. Had you known that on September 15th, 1995 there had been a closing where Lennar closed on Phase 1, would you have signed Exhibit 2 [the general release]?
A. I would have signed it, I could have signed it.
Q. You would have?
A. Yes.
Q. So the [Lennar] closing of the 15th was not a determinative factor in your executing this release, correct?
A. Correct.
Despite his unequivocal testimony on this issue, Soler subsequently asserted that had he known on October 30, 1995 that there had been a closing with Lennar on September 15th, he would not have signed the release. In support of his position, Soler cites to his contrary testimony given at a July 21, 1997 hearing, and his affidavit attached in response to appellees' motion for summary judgment. He explained the discrepancy in his testimony by stating that he was confused and/or intimidated at his July 10, 1997 deposition.
It is well settled that where there is no credible explanation for discrepancies between earlier unequivocal testimony and later inconsistent testimony, that the later testimony will be stricken. See Elison v. Goodman, 395 So.2d 1201 (Fla. 3d DCA 1981). See also Arnold v. Dollar Gen. Corp., 632 So.2d 1144 (Fla. 5th DCA 1994)(party to lawsuit will not be allowed to repudiate his or her prior deposition testimony by affidavit executed by that party or by another person, without a credible explanation given in the affidavit or in record itself); Cary v. Keene Corp., 472 So.2d 851 (Fla. 1st DCA 1985)(stating that: "[a]n unsubstantiated assertion is not sufficient to overcome the effect of ... prior testimony"). Here, the trial court found nothing to support Soler's assertions at the summary judgment hearing that he was "confused" and/or "intimidated" at his earlier July 10, 1997 deposition. Since the trial court didn't have to accept Soler's explanation for the discrepancy in his sworn testimony, we find that Soler's later testimony was properly disregarded by the trial court. See, e.g., Elison v. Goodman, 395 So.2d at 1202; Ondo v. F. Gary Gieseke, P.A., 697 So.2d 921, 924 (Fla. 4th DCA 1997).
*70 Thus, since Soler's unequivocal testimony makes clear that he did not detrimentally rely on appellees' alleged concealment of the Spanish Lakes closing, the trial court correctly found that no fraud existed as a matter of law. Given Soler's personal execution of the memorandum and subsequent release of the appellees[8], we find that summary judgment was proper with regards to Spanish Lakes, and therefore affirm.[9]See Tarr v. Cooper, 708 So.2d 614, 615 (Fla. 3d DCA)(summary judgment is proper where there is no admissible evidence to support an essential element of a claim), rev. denied, 722 So.2d 194 (Fla. 1998).

THE DORAL ESTATES
We find the procedural posture of this case to be somewhat different where Doral Estates is concerned. To begin with, there is no release between the parties regarding this property. Secondly, our holding in Soler I mandated that this cause be abated and remanded for a determination as to whether a partnership/joint venture had ever been formed. Soler I, 706 So.2d at 897. The parties in this case agreed to arbitrate that precise question. Thus, the trial court's entry of summary judgment based upon its conclusion that no joint venture existed between Soler and the appellees with regard to Doral Estates was beyond the trial court's jurisdiction.
Moreover, viewing the record evidence in the light most favorable to Soler regarding the Doral Estates property, we conclude that genuine issues of material facts abound to preclude a disposition of this matter by way of a summary judgment. Thus, summary judgment was improper and we reverse. See Moore v. Morris, 475 So.2d 666, 668 (Fla.1985)(in passing on summary judgment motion the court must view the evidence in the light most favorable to the non moving party); Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966)(moving party for summary judgment must prove the lack of genuine issues of material fact).[10]
Based on the foregoing, we hold that summary judgment in favor of the appellees regarding the Spanish Lakes property was proper and therefore is affirmed. However, with regard to the Doral Estates property we find that the trial court's entry of summary judgment exceeded its limited jurisdiction pursuant to the arbitration agreement, and we therefore reverse that portion of the final summary judgment and remand for arbitration.
Affirmed in part, reversed in part and remanded.
COPE, J. (dissenting).
The parties in this case entered into an agreement "for a private, binding and final arbitration of all disputes between the parties...." (Emphasis added). "All" means "all." There is no exception for a motion for summary judgment. The summary judgments should therefore be reversed and the cause remanded for arbitration.

I.
The parties are former joint venture partners in the field of real estate development. They had a parting of the ways and *71 wound up in three lawsuits in the circuit court.[1]
The parties entered into an arbitration agreement which provides for the three lawsuits to be decided by Stanley Price as the sole arbitrator.
In the first of the three cases, the arbitrator ruled for appellants (collectively "Soler"). The appellees (collectively "Secondary Holdings" or "Secondary") were unsuccessful in overturning the award.
Obviously fearful that they would lose the remaining arbitrations, Secondary advanced a new reading of the arbitration agreement. According to Secondary, a procedural clause in the arbitration agreement allowed it to avoid arbitration by filing a motion for summary judgment with the trial court. The trial court granted summary judgment in favor of Secondary on the remaining two cases, and Soler has appealed.

II.
The arbitration agreement says three times that the arbitrator is to resolve all disputes between the parties. The agreement provides:
I. Preamble
1. This Agreement provides for a private, binding and final arbitration of all disputes between the parties, as listed above.
2. It is the intention of the parties that the arbitration provided for in this Agreement constitute the mechanism for resolution of all remaining differences between the parties with respect to the claims and defenses in or related to the Litigations.
II. The Arbitrator
3. The parties have agreed that Stanley Price (the "Arbitrator") will act as the sole arbitrator. As between the parties, the Arbitrator shall have the full authority of a Florida Circuit Court Judge and an arbitrator acting under the auspices of The American Arbitration Association ("AAA").
* * *
III. Procedure
* * *
10. In order to place the Litigations "at issue," as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure, the parties will continue to submit all pleading-related, pre-answer motions to the circuit court.
11. It is the intent of the parties that full and complete discovery be had between the parties and from non-parties who possess relevant and material information. The parties will continue to submit all discovery disputes to the circuit court, whose rulings will be deemed by the parties as non-appealable. In the event any party fails to comply with any order of the court or the Arbitrator, the aggrieved party may request that the Arbitrator enter appropriate relief, including the imposition of all sanctions available to the court, which the parties hereby agree to comply with and be bound by.
* * *
IV. Miscellaneous

* * *
16. It is the parties' intent that the arbitration fully and finally determine all issues which have been, or which could have been, raised in the Litigations. The arbitration award shall be final and binding upon the parties, and may be challenged only upon the grounds specified in Florida Statute § 682.13.

*72 * * *
21. Each party agrees that it will faithfully observe this and any other stipulation or order duly entered in the Arbitration and will use its best efforts to facilitate the prompt disposition of the Arbitration proceeding.
(Emphasis added).[2]
In the clearest terms, the agreement provides that the arbitration will resolve "all remaining differences between the parties with respect to the claims and defenses in or related to the Litigations." (Emphasis added). Agreement, ¶ 2. To that end, the arbitrator is given the full authority of a circuit judge as well as an arbitrator. Agreement, ¶ 3. If there were any doubtand there is none"doubts about the scope of the agreement should be resolved in favor of arbitration." Regency Group, Inc. v. McDaniels, 647 So.2d 192, 193 (Fla. 1st DCA 1994) (citations omitted); see also State Farm Fire & Casualty Co. v. Middleton, 648 So.2d 1200, 1201-02 (Fla. 3d DCA 1995).
The agreement does, of course, reserve a role for the trial judgebut that role is a very limited one. In a section entitled "Procedure," the parties have provided that the trial court will rule on motions addressed to the pleadings, so that the action will be placed at issue, see Agreement, ¶ 10, and discovery disputes will be submitted to the circuit court. See id. ¶ 11. The circuit court does not, however, have the power to enforce discovery orders; that power is instead given to the arbitrator. See id. Thus, the power to impose financial sanctions or the extreme sanction of dismissal is given to the arbitrator, not the judge.
When the agreement is read as a whole, the parties have explicitly given the power to decide the litigation to the arbitrator, not the circuit judge.

III.
Secondary argues, however, that paragraph ten of the agreement somehow created an exception which allowed the trial judge to yank the lawsuits out of arbitration and decide them by summary judgment. Secondary's argument is dead wrong. Paragraph ten has nothing to do with summary judgment.
Paragraph ten states, "In order to place the Litigations `at issue,' as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure, the parties will continue to submit all pleading-related, pre-answer motions to the circuit court." Agreement, ¶ 10 (emphasis added).
To begin with, "pleading-related, pre-answer motions" (emphasis added) are motions which attack the legal sufficiency of the pleadings, i.e., a motion to dismiss, to strike, or for more definite statement. "Defects in the statement of a cause of action in the initial pleading are reached by motion to dismiss for failure to state a cause of action, to strike or for more definite statement." Henry P. Trawick, Trawick's Florida Practice and Procedure § 7-5.1, at 126 (1999) (footnote omitted); see Fla. R. Civ. P. 1.140(b), (e); Bruce J. Berman, Florida Civil Procedure ¶¶ 140.4[2][e], 140.4[7][a] (1999).[3]
A motion for summary judgment is not a pleading-related motion; it is the direct opposite. A motion to dismiss is confined to the four corners of the complaint and tests its legal sufficiency. A motion for summary judgment goes outside the pleadings and tests "the sufficiency of facts to which substantive legal principles are applied." Henry P. Trawick, Trawick's Florida Practice and Procedure § 25-5, at 425. By definition, paragraph ten does not include a motion for summary judgment.
The purpose of paragraph ten is very simple. At the time the parties entered *73 into this arbitration agreement, there were three lawsuits pending but the pleadings were not yet closed within the meaning of Rule 1.440. The obvious purpose of paragraph ten was to require completion of the pleadings so that each side and the arbitrator would know the parties' respective claims and defenses.
In order to accomplish this, paragraph ten directs the parties to place the action "at issue" as defined in Florida Rule of Civil Procedure 1.440. Rule 1.440 defines "at issue" as follows: "An action is at issue after any motions directed to the last pleading served have been disposed of or, if no such motions are served, 20 days after service of the last pleading." Fla. R. Civ. P. 1.440(a) (emphasis added). By "motions directed to the last pleading" Rule 1.440 is talking about motions to dismiss, strike, or for more definite statement not motions for summary judgment. The entire purpose of Rule 1.440 is to prescribe when a matter is ready to be set for trial or, in this case, for consideration by the arbitrator. See Henry P. Trawick, Jr., Trawick's Florida Practice and Procedure § 22-2; Bruce J. Berman, Florida Civil Procedure ¶ 440.5, at 519-21; 55 Fla. Jur. 2d Trial § 8 (2000). Rule 1.440 has nothing to do with summary judgment.
The mistake in the majority opinion is that it discusses "at issue" in a colloquial sense. See majority opinion at 66. But the arbitration agreement uses "at issue" in a technical sense: the litigation must be placed "`at issue' as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure ...." Agreement, ¶ 10 (emphasis added). The majority opinion never addresses the term "at issue" as defined in Rule 1.440.
The majority opinion takes the position that the trial court can decide whether there is an arbitrable issue under the parties' arbitration agreement. That is true as an abstract proposition, but irrelevant here.
In this case the parties agreed to "a private, binding and final arbitration of all disputes between the parties...." Agreement, ¶ 1 (emphasis added). There is no substantive dispute which is excluded from arbitration.
The majority opinion claims that it is a threshold issue for the court to decide whether there was an earlier settlement of the Spanish Lakes controversy. See majority opinion at 66. But the merits are for the arbitrator, not the court. Secondary has asserted the defense that there was a settlement and release with Soler on the Spanish Lakes development. Soler contends that these were obtained by fraudulent inducement. Secondary replies that there was no reliance by Soler on anything Secondary said or did. Obviously this is a factual dispute for the arbitrator to decide.
The Arbitration Code is clear. The only question for the trial court is whether the parties made an arbitration agreement which covered this controversy. See § 682.03(1), (4), Fla. Stat. (1999). Since the arbitration agreement clearly covers all disputes, the only role for the court is to send this matter to arbitration.
Writing in an arbitration context, the Florida Supreme Court has said that "any interpretation of a contract or term which `gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" State Farm Fire and Casualty Co. v. Licea, 685 So.2d 1285, 1287 (Fla.1996) (citations omitted); see also Paradise Plaza Condominium Association, Inc. v. Reinsurance Corp. of New York, 685 So.2d 937 (Fla. 3d DCA 1996) (en banc).
The arbitration agreement makes the arbitrator the decision-maker in the case, conferring on him the powers of arbitrator and circuit judge. By reading paragraph tena purely procedural provisionto allow the trial judge to oust the arbitrator and decide the case herself, the majority opinion runs contrary to Licea and Paradise Plaza.
*74 It is most telling that Secondary was perfectly happy to be in arbitration until it lost the first case. Only then did it arrive at its effort to reinterpret the arbitration agreement as one which provides for summary judgment, not arbitration. We have disapproved such a post-loss gambit in an analogous case. See Dadeland Square, Ltd. v. Gould, 763 So.2d 524 (Fla. 3d DCA 2000). As in Dadeland, the arbitration agreement should be enforced.
The summary judgment should be reversed and the cause remanded with directions to the parties to proceed with arbitration in accordance with their agreement.

IV.
Assuming arguendo that the motion for summary judgment was cognizable by the trial court, the judgment should be reversed not only as to Doral Estates but also as to Spanish Lakes. One of the issues in the case is whether the release was procured by fraud. Reading the record in the required light, Secondary Holdings induced Soler to part with his interest in the project two days before Lennar purchased the first phase of Spanish Lakes which produced a net sum of $3.6 million. The entire premise of the negotiation between Secondary and Soler was that the project was in severe financial straits with no end in sight. Plainly it was a material nondisclosure to fail to advise Soler that a closing with Lennar would occur within two days.
It has long been said that where the issue is fraud, the courts should be specially cautious when granting summary judgment.
The issue of fraud is not ordinarily a proper subject for summary judgment because, being a subtle matter, fraud requires a full explanation of the facts and circumstances of the alleged wrong to permit a determination whether they collectively constitute fraud, and for that reason such determination is seldom one that can be made in a legally sufficient manner without a trial.
Nessim v. De Loache, 384 So.2d 1341, 1344 (Fla. 3d DCA 1980) (citations omitted); see Lewis v. Kranz, 599 So.2d 253 (Fla. 3d DCA 1992); Burton v. Linotype Co., 556 So.2d 1126, 1128 (Fla. 3d DCA 1989).
In this case the trial court concluded that Soler had changed his testimony, but the surrounding circumstances support Soler's assertion that he misunderstood the question. No reasonable person in Soler's position would have bargained away his interest in the project at the very moment that Lennar's $3.6 million purchase was about to alleviate the financial woes of the land development venture. Secondary kept this important information about the Lennar purchase secret from Soler until Secondary had separated him from the project. The summary judgment should be reversed entirely.

APPENDIX

Arbitration Agreement
This Agreement is made this ____ day of May, 1998 between the parties in the matters of:
(1) Shores Development, Inc. v. Jose I. Soler, et al., Case No. 97-03485 (CA 06) (the "Aristotle Litigation");
(2) Jose I. Soler, et al. v. Secondary Holdings, Inc., et al., Case No. 97-03841 (CA 06) (the "Spanish Lakes Litigation") and
(3) Latterner v. JSW, Corp., Case No. 97-24217 (CA 06) (the "Latterner Litigation").
The Aristotle Litigation, the Spanish Lakes Litigation and the Latterner Litigation will be referred to, collectively, as the "Litigations." The Litigations include all claims, counter-claims, third party claims, cross claims or ancillary claims or relief which could have been brought in connection with any of the aforementioned disputes by any party.

*75 I. Preamble
1. This Agreement provides for a private, binding and final arbitration of all disputes between the parties, as listed above.
2. It is the intention of the parties that the arbitration provided for in this Agreement constitutes the mechanism for resolution of all remaining differences between the parties with respect to the claims and defenses in or related to the Litigations.

II. The Arbitrator
3. The parties have agreed that Stanley Price (the "Arbitrator") will act as the sole arbitrator. As between the parties, the Arbitrator shall have the full authority of a Florida Circuit Court Judge and an arbitrator acting under the auspices of The American Arbitration Association ("AAA").
4. The parties may not communicate with the Arbitrator other than as provided by the AAA Rules and the Code of Ethics for Arbitrators in Commercial Disputes. The parties hereby agree that the Arbitrator is to act as a completely neutral arbitrator in this proceeding.
5. The Arbitrator shall file the following sworn oath in this proceeding:
"I solemnly swear that I will faithfully and fairly hear and examine the matters in controversy and that I will make a just decision pursuant to the terms of this agreement and to the best of my understanding."

III. Procedure
6. The initial trial in this matter shall commence on or before August 18, 1998. At this proceeding the Spanish Lakes Litigation will be tried first, followed by the Aristotle and Latterner Litigations, which will be tried together. The parties desire to close this trial not later than August 31, 1998 and to submit all (if any) post-hearing briefs no later than September 15, 1998. Although, the parties will use their best efforts to comply with these deadlines, a failure to complete the hearings within the time specified due to circumstances outside the control of the parties, such as the Arbitrator's schedule, shall not impair this agreement.
7. The parties acknowledge that all non-accounting claims asserted by the plaintiff in the Spanish Lakes Litigation have been previously ordered stayed and abated. See Laurence v. Soler, 706 So.2d 896 (Fla. 3rd DCA 1998). The parties agree that this ruling, as well as all prior orders of the court in all Litigations, shall be given full force and effect in the arbitration. Thus, as relates to the Spanish Lakes Litigation, only the accounting claims will be presented to the Arbitrator at the initial trial. Without admitting anything, the parties agree that the viability of the abated, non-accounting claim will be addressed by the Arbitrator after the conclusion of the August 1998 trial of the accounting claim. If necessary, the merits of these claims will be resolved at a subsequent trial to be scheduled by the Arbitrator.
8. The parties further acknowledge that a motion to abate all non-accounting claims is presently pending in the Aristotle Litigation. The circuit court's ruling on this motion will be deemed by the parties as non-appealable. Any claims which may be stayed and/or abated in the Aristotle litigation will be treated and heard in the same manner as the stayed and abated claims in the Spanish Lakes Litigation are treated under the preceding paragraph.
9. The Arbitrator shall issue the arbitration award no later than thirty (30) days from the date of the closing of the hearing, which shall be delivered by fax and overnight mail and shall be paid within thirty (30) business days of being received, provided that no party has filed any proceedings directed toward the award in accordance with Florida Statute § 682, et seq.
10. In order to place the Litigations "at issue," as that term is defined in Rule 1.440 of the Florida Rules of Civil Procedure, the parties will continue to submit all *76 pleading-related, pre-answer motions to the circuit court.
11. It is the intent of the parties that full and complete discovery be had between the parties and from non-parties who possess relevant and material information. The parties will continue to submit all discovery disputes to the circuit court, whose ruling will be deemed by the parties as non-appealable. In the event any party fails to comply with any order of the court or the Arbitrator, the aggrieved party may request that the Arbitrator enter appropriate relief, including the imposition of all sanctions available to the court, which the parties hereby agree to comply with and be bound by.
12. The parties contemplate that the Arbitrator will issue a pre-trial scheduling order which will set out deadlines for pretrial submissions of memoranda and disclosure of the identity of witnesses, including experts, containing a description of the nature and testimony to be offered by the witness.
13. All relevant former deposition and hearing testimony and exhibits, all documents introduced at previous hearings and all documents produced by and between the parties shall be deemed admissible as evidence in the arbitration, assuming it is otherwise relevant to the issues submitted. Neither party will be required to call records custodians to authenticate any documents at the arbitration proceeding.
14. All questions and issues of substantive and procedural law will be decided in accordance with, and shall be governed by, Florida law.

IV. Miscellaneous

15. The compensation charged by the Arbitrator in connection with the arbitration proceedings shall be borne by the parties proportionately to the total number of parties participating in the arbitration. The Arbitrator shall have the authority to re-allocate those particular expenses in accordance with the terms and conditions of the award. The Arbitrator shall also have the authority to award any party any other expenses incurred in connection with the proceedings, including attorneys' fees and costs (if provided for by Florida law). This provision shall not impair the ability of the Arbitrator to award attorneys' fees or costs as a sanction for a parties' noncompliance with orders issued by the Arbitrator.
16. It is the parties' intent that the arbitration fully and finally determine all issues which have been, or which could have been, raised in the Litigations. The arbitration award shall be final and binding upon the parties, and may be challenged only upon the grounds specified in Florida Statute § 682.13.
17. Notices of hearing, awards or any other matter relating to the Arbitration shall be deemed properly given if sent to the parties, in care of their respective counsel, as identified below.
18. Numerous parties have asserted claims for exemplary, or punitive, damages. The parties agree that the Arbitrator is empowered and has the authority to award such damages.
19. The arbitration award shall be in writing and shall distinguish between compensatory and punitive damages.
20. The arbitration award may be enforced by any court of competent jurisdiction, including the circuit court presiding over this case, upon application of either party.
21. Each party agrees that it will faithfully observe this and any other stipulation or order duly entered in the Arbitration and will use its best efforts to facilitate the prompt disposition of the Arbitration proceeding.
22. Once the terms of the Arbitrator's decision have been complied with the parties shall execute full and complete mutual general releases.
*77 23. This Agreement has been executed by the parties with the assistance of counsel and is binding in all respects and upon all successors in interest, heirs, subsidiaries, related entities, executors or assigns.
NOTES
[1] Summary judgment in favor of Secondary, Shores, Rosen and Latterner was granted March 24, 1999. A second summary judgment, on the same grounds, was granted March 25, 1999, in Laurence's favor. Final Judgment in favor of Secondary, Shores, Rosen and Latterner was entered May 24, 1999. These orders will be discussed collectively.
[2] Florida Rule of Civil Procedure 1.440 provides in pertinent part:

(a) When at Issue. An action is at issue after any motions directed to the last pleading served have been disposed of or, if no such motions are served, 20 days after service of the last pleading. The party entitled to serve motions directed to the last pleading may waive the right to do so by filing a notice for trial at anytime after the last pleading is served.... Fla.R.Civ.P. 1.440(a).
[3] The term "Spanish Lakes Litigation" refers specifically to this proceeding, and all claims asserted in Soler's complaint, including the Doral Estates claim.
[4] Appellees' motion for summary judgment specifically addresses the validity of several counts in Soler's amended complaint. If as the appellees contended, a valid release was executed with regard to the Spanish Lakes property, then said counts would have been extinguished. Clearly, the motion for summary judgement was "pleading-related." Moreover, whether Soler's claims regarding Spanish Lakes were extinguished could only be addressed by a motion for summary judgment, since the release and Soler's deposition testimony were not attached, or contained within, the four corners of the complaint. This procedure, however, is clearly within our rules. See Fla. R. Civ. P. 1.510(b) (A party against whom a claim ... is asserted ... may move for a summary judgment in that party's favor as to all or any part thereof at any time with or without supporting affidavit.). See also Coral Ridge Props., Inc. v. Playa Del Mar Assoc., Inc., 505 So.2d 414, 417 (Fla.1987) (McDonald, C.J. concurring)(defendant is not precluded from obtaining summary judgment prior to answering).

Obviously, since an answer has not been filed in this case, the summary judgment motion was also a "pre-answer motion."
[5] Respectfully, the dissent's proposition that "all means all" and therefore no dispute should be resolved by the trial court, totally vitiates the language and purpose of paragraph 10 of the arbitration agreement.
[6] The only arbitration that has taken place is in the "Aristotle Litigation" which does not involve the Spanish Lakes property and has no bearing to the issues in this case.
[7] A reciprocal release was executed by the appellees to Soler, his father and Resol.
[8] "Where language of a release is clear and unambiguous a court cannot entertain evidence contrary to its plain meaning." Cerniglia v. Cerniglia, 679 So.2d 1160, 1164 (Fla. 1996).
[9] Regarding Spanish Lakes, Soler has identified numerous issues of fact concerning the parties' relationshipissues which the appellees do not deny. These issues, however, are irrelevant, given Soler's personal total release of the appellees.
[10] The burden is even higher where, as in this case, the summary judgment motion is filed before the defendants have filed an answer. See Lakes of the Meadow v. Arvida/JMB Partners, L.P., 714 So.2d 1120, 1122 (Fla. 3d DCA 1998)(stating that: "[t]he movant's burden is especially heavy where, as here, the pleadings are not closed.... The ... moving party is not entitled to summary judgment unless the developer can show that no issue of material fact can be presented").
[1] The cases are: Shores Development, Inc. v. Jose I. Soler, et al., Case No. 97-03485 (CA 06) (the "Aristotle Litigation"); Jose I. Soler, et al. v. Secondary Holdings, Inc., et al., Case No. 97-03841 (CA 06) (the Spanish Lakes Litigation) and Latterner v. JSW, Corp., Case No. 97-24217 (CA 06) (the "Latterner Litigation").
[2] The entire agreement is reproduced in the appendix.
[3] Insofar as pertinent here, the term "pleading" means complaint. See Fla. R. Civ. P. 1.100(a).